## HELVERING, Com'r of Internal Revenue, v. BARTLETT.

### No. 3625.

Circuit Court of Appeals, Fourth Circuit.
June 11, 1934.

Lucius A. Buck, Sp. Asst. to Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for petitioner.

J. Kemp Bartlett, of Baltimore, Md. (Bartlett, Poe & Claggett and C. Ross McKenrick, all of Baltimore, Md., on the brief), for respondent.

A. Mitchell Palmer, of Stroudsburg, Pa., Wm. D. Harris, of Washington, D. C., and Francis V. Barstow, of Boston, Mass., amici curiæ.

Before PARKER and NORTHCOTT, Circuit Judges, and PAUL, District Judge.

PARKER, Circuit Judge.

This is a petition to review a decision of the Board of Tax Appeals. The Commissioner of Internal Revenue made a deficiency assessment against J. Kemp Bartlett based on the addition to his income for the year 1929 of the sum of $21,246.60, being the value of 20,830 "rights" to subscribe to stock in the United States Fidelity & Guaranty Fire Corporation, which were allotted him as a stockholder in the United States Fidelity & Guaranty Company. The Board of Tax Appeals disallowed the assessment, and the Commissioner has filed this petition for review. The facts of the case were accurately and succinctly stated by the Board as follows:

"On January 15, 1929, the petitioner Bartlett owned 20,830 shares of common stock of the United States Fidelity & Guaranty Co., hereinafter referred to as the Guaranty Co., a Maryland corporation engaged in the business of issuing fidelity and surety bonds and casualty insurance policies. Stock

of the Guaranty Co. was widely distributed throughout the United States and Canada and business was done over that territory through approximately 6,000 agents. In the latter part of 1928 the directors of the Guaranty Co. determined to organize a fire insurance company, since it was not chartered to do such a business, to sell fire insurance through the Guaranty Co.'s agents and to its stockholders. It was determined to organize the new corporation with a capital of $1,-000,000 and a paid-in surplus of $3,000,000 by selling stock having a par value of $10 per share at $40 per share. The plan called for selling 100,000 shares of stock, 25,000 of which would be purchased by the Guaranty Co., 25,000 by the stockholders of the Guaranty Co., 25,000 by its agents, and the remaining 25,000 by certain financial institutions and individuals who were to serve as directors of the new company. The plan agreed upon was carried out and on November 27, 1928, the United States Fidelity Fire Corporation, hereinafter referred to as the Fire Co., was chartered under the laws of Maryland.

"At a meeting of the board of directors of the Guaranty Co. on November 21, 1928, the following resolutions were adopted:

"Resolved, that the Company purchase fifty thousand (50,000) shares of the capital stock of the United States Fidelity Fire Corporation of the par value of ten dollars ($10.00) per share, at and for the price of forty dollars ($40.00) per share; and be it further

"Resolved, that there be offered to the stockholders of the company of record as of the 15th day of January 1929, pro rata rights to purchase from the Company twenty-five thousand (25,000) shares of the capital stock of said United States Fidelity Fire Corporation of the par value of ten dollars ($10.00) each, at and for the price of forty dollars ($40.00) per share; and be it further

"Resolved, that the officers of the company be and they are hereby authorized and empowered to do all things necessary in connection with the purchase of said fifty thousand (50,000) shares of such stock and the offering for sale of twenty-five thousand (25,-000) shares of said stock to the stockholders, in accordance with the above resolutions.

"On February 5, 1929, the Guaranty Co. paid $1,000,000 to the Fire Co. to cover its subscription to 25,000 shares of stock. Certificates for such stock were issued by the Fire Co. to the Guaranty Co. on April 11, 1929, in blocks of 500 shares each. On Feb-

ruary 15, 1929, the financial institutions and individuals paid $1,000,000 to the Fire Co. for 25,000 shares of its stock while on the same day the agents of the Guaranty Co. paid their subscription for 25,000 shares of the Fire Co. stock. The remaining 25,000 shares were purchased by the stockholders of the Guaranty Co. for a total price of $1,000,000 in the following manner: The Guaranty Co. addressed a circular letter to its stockholders, inclosing a subscription warrant entitling the stockholders to subscribe to stock of the Fire Co. The letter set forth the resolutions of the board of directors of the Guaranty Co. on November 21, 1928, and explained that the rights must be exercised on or before February 15, 1929. On or before that date the Guaranty Co. received subscriptions and payment for stock of the Fire Co. in the total amount of 25,000 shares. On February 15, 1929, $1,000,000 was paid over to the Fire Co. by the Guaranty Co. and 25,000 shares of stock were issued by the Fire Co. directly to the subscribing stockholders. The Fire Co. received $4,000,000 for its 100,000 shares of capital stock and started business on March 1, 1929.

"No certificate or certificates were ever issued to the Guaranty Co. representing the 25,000 shares of stock of the Fire Co. which were purchased by the former's stockholders. Lists of such subscribers showing the name and address were prepared by the Guaranty Co. and delivered to the Fire Co. and certificates were issued directly to the subscribers. Those persons who exercised "rights" remitted to the Guaranty Co. and the total amount received by it was then paid over to the Fire Co.

"Rights to subscribe to stock of the Fire Co. were traded in on the Baltimore Stock Exchange prior to February 15, 1929, at prices ranging from 83 cents to $1.20. The petitioner Bartlett exercised his rights to subscribe for shares at a price of $40 per share."

■■■ To this statement it should be added that the Commissioner found the fair market value of the "rights" as of the date of the receipt thereof to be $1.02 each, or a total of $21,246.60, and ruled that this amount must be included in the taxpayer's gross income. On January 17, 1933, when the taxpayer testified before the Board of Tax Appeals, he still held the stock in the Fire Company which he had purchased; no dividend had ever been declared or paid upon same; and the shares for which he had paid $40 each were then worth only $6.50. The Board held that the taxpayer had realized no tax-

able profit or dividend because of the allotment to him of the "rights" to purchase the stock which he had purchased.

We think that this holding of the Board was clearly right. We are not dealing with a case where a stockholder who has received rights to purchase stock sells the rights and thus realizes a profit. If the taxpayer here had sold the rights allotted him, the amount received on such sale would, of course, have been taxable as income. Miles v. Safe Deposit & Trust Co., 259 U. S. 247, 42 S. Ct. 483, 66 L. Ed. 923; Metcalf's Estate v. Commissioner (C. C. A. 2d) 32 F.(2d) 192. But he did not sell the rights. He exercised the option which they conferred upon him to purchase stock in the fire company; and he has as yet realized no profit upon this transaction. The rights were nothing but options to purchase stock, and the fact that they were allotted to stockholders of the Guaranty Company did not make them in any sense dividends. An option is but a continuing offer; and, when the offer is accepted, it is merged in the contract which results. We have, then, nothing upon which to predicate an assessment of the tax but a purchase of stock by the taxpayer; and it is well settled that such a transaction does not give rise to taxable income until a profit is realized by the sale of the stock purchased. The taxing statutes are not based upon the theory that a man can "buy himself rich."

The Commissioner relies upon a line of cases including U. S. v. Phellis, 257 U. S. 156, 42 S. Ct. 63, 66 L. Ed. 180; Rockefeller v. U. S., 257 U. S. 176, 42 S. Ct. 68, 66 L. Ed. 186; Cullinan v. Walker, 262 U. S. 134, 43 S. Ct. 495, 67 L. Ed. 906; and Marr v. U. S., 268 U. S. 536, 45 S. Ct. 575, 69 L. Ed. 1079, all of which involved the distribution of assets either in cash or in stock of a different corporation. The distinction is obvious. No assets of the Guaranty Company here were distributed to its stockholders. None of its assets were transferred to the corporation which was being organized. The fact that the Fire Company would do business through the agents of the Guaranty Company was in no sense a distribution or transfer of assets. All that the Guaranty Company did was to acquire in behalf of its stockholders options to subscribe to stock in the Fire Company and to allot these options to them in accordance with their holdings; and it seems clear that one is not to be taxed as upon income merely because he acquires an option which he might sell for value. If he allows the option to expire without exercising it, he has, of course, received no income. If he sells his rights under the option, he is taxable on the amount received on the sale. If he exercises it by making a purchase, his income from the transaction is determined on the basis of the profit realized when he sells the property purchased. The taxpayer here exercised the option secured for him; and his situation is not different from what it would have been if he had purchased any other property under an option obtained for him by a corporation in which he was interested. It will hardly be contended that the nonstockholder to whom rights were allotted and who purchased stock under the options thereby conferred, or that the Guaranty Company itself, which purchased stock under rights obtained by it, was taxable on the rights under which the stock was purchased; but there would seem to be just as much reason in taxing them on the value of the rights as in taxing the stockholders in the Guaranty Company, for all received the same sort of rights and exercised them in the same way.

In Miles v. Safe Deposit & Trust Co., supra, it was held that, where a stockholder sold rights to subscribe to new stock in a corporation, the amount thus realized was taxable as income; but the court pointed out that, if he had decided to accept the new shares instead of selling the rights, there would have been no profit and hence no taxable income. It is true that in that case, it was the stock of the same corporation which was referred to; but the same principle would hold as to the purchase of stock of another corporation. No profit is realized upon a purchase; and the mere according of a right to purchase is not to be treated as a dividend or distribution of assets, unless these are in fact involved and the right to purchase is a mere cloak for a transaction which is essentially something else.

The Commissioner contends that the rights to purchase were acquired by the Guaranty Company, and that their allotment to its stockholders was the allotment of rights of value constituting in effect a dividend. But a "dividend" is defined by the Revenue Act of 1928, § 115(a), 45 Stat. 822, 26 USCA § 2115(a) as "any distribution made by a corporation to its shareholders, whether in money or in other property, out of its earnings or profits accumulated after February 28, 1913." The allotment of rights here was not a distribution of earnings or profits. The rights to subscribe for stock were by prearrangement acquired for stockholders; and, even if this had not been true, the acquisi-

tion of such rights did not result in earnings or profits to the Guaranty Company. The Guaranty Company, like its stockholders, realized no profit by the mere acquisition of the option. A profit would have been realized only if it had sold its rights under the option or had purchased the stock and sold it at a profit. Even a purchase at a bargain does not result in taxable income, unless used as a cloak for what is in fact a dividend. Commissioner v. Van Vorst (C. C. A. 9th) 59 F.(2d) 677. Certainly, then, a mere option to purchase which is transferred without consideration cannot be said to result in earnings or profit to either the transferor or transferee. A different situation would, of course, be presented if the Guaranty Company had transferred assets to the Fire Company and a preferential right to purchase stock at less than its real value had been accorded the stockholders of the former; for this would amount to a distribution of assets by the Guaranty Company to the stockholders who exercised the right to purchase. But that is not the situation here, and there is nothing to indicate that the formation of the Fire Company was in any sense a cloak for the payment of a dividend or the distribution of assets.

The case of Metcalf's Estate v. Commissioner, supra, is relied upon by the Commissioner as authority for the position that the allotment of the rights to the stockholders was in effect the distribution of a dividend; but that case is not in point on the facts presented here. There the parent company had transferred assets to the company the stock of which was offered to its stockholders, and the taxpayer had sold the rights to purchase allotted to him. The question was whether he was taxable on the amount received from the sale of the rights, in view of the fact that the stock without the rights was worth just that much less and that, if he had sold both at the prevailing price, he would have sustained a loss. The court held, and we think properly, that he was taxable on the amount received from the sale of the rights. Certainly if he was taxable upon the amount received from the sale of rights to purchase stock in the same company, as was held in Miles v. Safe Deposit & Trust Co., supra, he was taxable when the rights sold were to purchase in a different company. The treatment of the assignment of rights as a dividend, although not necessary to the decision, was justified in that case by reason of the fact that there was a determination by the Commissioner that "the value of the rights did not draw from the capital of the Southern Pacific Company, but from its surplus." See (C. C. A.) 32 F.(2d) 192, 195. Here the value of the rights drew neither from the capital nor from the surplus of the Guaranty Company; and, as heretofore stated, there was not even indirectly any distribution of assets, earnings, or profits.

As has been often said, taxation is a practical matter. The income tax law is concerned, generally speaking, only with realized gains or losses. Lucas v. American Code Co., 280 U. S. 445, 449, 50 S. Ct. 202, 74 L. Ed. 538, 67 A. L. R. 1010; Burnet v. Logan, 283 U. S. 404, 413, 51 S. Ct. 550, 75 L. Ed. 1143. And no gain has been realized by this taxpayer as a result of the allotment to him of the rights in question or of his purchase under those rights. That he might have realized a profit if he had sold the rights is beside the point. Taxes must be imposed on the basis of what has happened, not on the basis of what might have happened. It is important to note that the exact case here presented is covered by G. C. M. 7246, C. B. 1929, p. 80: and the administrative practice thus prescribed is entitled to great weight in determining the applicability of the statute which the government invokes. Logan v. Davis, 233 U. S. 613, 627, 34 S. Ct. 685, 58 L. Ed. 1121.

For the reason stated, we think that the decision of the Board of Tax Appeals was correct, and same will accordingly be affirmed.

Affirmed.