## COMMISSIONER OF INTERNAL REVENUE v. PALMER.*

### No. 3100.

Circuit Court of Appeals, First Circuit.

Feb. 12, 1937.

*Writ of certiorari granted 57 S.Ct. 943, 81 L.Ed. ——.

WILSON, Circuit Judge, dissenting.

Ellis N. Slack, Sp. Asst. to Atty. Gen. (Robert H. Jackson, Asst. Atty. Gen., and Sewall Key and Norman D. Keller, Sp. Assts. to Atty. Gen., on the brief), for the Commissioner.

Robert G. Dodge, of Boston, Mass. (A. Mitchell Palmer and William D. Harris, both of Washington, D. C., and Francis V. Barstow, of Boston, Mass., on the brief), for Bradley W. Palmer.

D. A. Embury, of New York City, amicus curiæ.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

560

MORTON, Circuit Judge.

This is a petition by the Commissioner of Internal Revenue to review a decision by the Board of Tax Appeals which was adverse to the government. The tax involved is an additional (or deficiency) assessment of income taxes for the year 1929. The facts are stipulated in great detail. The case was heard by the Board on the stipulation and the documentary exhibits.

The taxpayer, Mr. Palmer, was a shareholder in the American Superpower Corporation. That corporation acquired a large block of the capital stock of the United Corporation. By proper corporate action, it offered this stock for sale to its own stockholders at $25 per share, in the proportion of one share of United to each two shares of Superpower. This offer was made to the stockholders of the Superpower Corporation in the form of "Purchase Certificates" or rights to purchase United stock, two rights being required in order to buy one share of United. The rights had to be exercised by a certain date or they lapsed. They were actively traded in on the New York Curb Exchange at prices which varied from day to day, the lowest being 11⅝ and the highest 21. The cost of a share of United Corporation bought from the Superpower Corporation under them would of course be $25 plus the cost of two rights.

After the sales under this first offer had been completed and that transaction closed, Superpower made to its stockholders in May, 1929, a second offer of United stock. This offer was similar to the first, except that the price at which United stock was offered was $30 instead of $25, and four rights instead of two rights were required to buy a share. Thereafter Superpower made a third offer to its stockholders of a different stock that of the Commonwealth & Southern Corporation. This offer was similar in principal to the others, differing as to purchase price, number of rights required, dates, etc. On these later offers rights were issued as on the first offer; and the later rights were traded in on the New York Curb as the others had been; they were freely bought and sold and, until they lapsed, had substantial value. Mr. Palmer sold none of his rights under any of the offers. He exercised them all, paid Superpower the required amounts, and took the stock so purchased.

As to the first offer: The Commissioner held that, as the stock to which the rights related was not stock of the corporation which issued them, and as the rights were salable, the amount for which Mr. Palmer might have sold them—though he never did so—constituted income. The Commissioner imposed additional taxes accordingly. The Board of Tax Appeals set aside his action, holding that the price of $25 per share as of January, 1929, was "a fair market price" for the United stock; that the offer was not intended as a cloak for the payment of a dividend; and that the mere receipt of rights, although they had salable value, did not constitute income.

Two principal questions are involved: (1) Whether the Board's findings of fact were unsupported by any substantial evidence or were based on erroneous rulings of law, and therefore should be set aside; and (2) whether the mere receipt of rights which were not sold but were held and exercised constituted income. The first question calls for a somewhat fuller statement of the facts as they appear in the stipulation and in the Board's findings and of the way in which the Board dealt with the matter.

Several different corporations and firms which owned large amounts of stock in certain public utility corporations formed a plan for bringing their holdings into a common ownership through a holding company. The United Corporation was formed for this purpose on or about January 7, 1929. The persons and corporations interested in its organization transferred to it large blocks of public utility stocks and received in payment therefor shares of the new corporation. The Superpower Corporation was one of the organizers. It turned in shares of utility stocks and received therefor, inter alia, 2,210,853 shares of the common stock of the United Corporation, and also 1,000,000 "option warrants," each of which entitled the holder of it to purchase from the United Corporation at any time one share of its common stock for $27.50. The management of Superpower, for the purpose of strengthening its cash position and establishing a market for the new United stock, decided to offer to sell part of its United stock to its own stockholders as above stated. The offer was formally made to the stockholders by vote of the directors of Superpower on January 23, 1929, and resulted in the issue of the rights here involved.

The Board said in its opinion:

"The stipulated facts negative the idea that Superpower had any intention of distributing to its stockholders any of its earnings or any of its assets by the sale of certain shares of common stock of United and of Commonwealth to its stockholders. The resolutions of the Board of Directors of Superpower relating to these sales do not refer to them as dividends or as distributions of its assets. In its books of account the sales are treated as *sales* (italics supplied) of assets and not otherwise. It is stipulated that 'on its books of account The American Superpower Corporation made no charge against nor deduction from its profits and loss or earnings account, its earned surplus account, or its paid-in surplus account, in connection with or as a result of the issuance of the "Purchase Certificates" pursuant to the provisions of the aforesaid resolutions of January 23, 1929, May 1, 1929, and June 5, 1929.'

"As above indicated, the stipulated facts show that the respondent (the Commissioner) determined the 'total fair market value' of all the securities received by Superpower from United in January 1929 to be $72,480,000. He allocated this value to the three classes of securities received and determined the fair market value of the common shares to be $25 per share. This is the exact price at which Superpower offered the first block of 821,472 shares of common stock of United to its stockholders. No valid argument can be made that Superpower *intended to distribute* (italics supplied) to its stockholders any portion of its assets by selling 821,472 common shares of United to them at a fair market value. Upon the sale of the stock at $25 per share Superpower realized a profit of $16.05 on each share.

"That $25 was a fair market price for the stock in January 1929 is further evidenced by the fact that J. P. Morgan & Co. and Bonbright & Co., pursuant to the agreement made between the interested parties, each subscribed for and purchased from United 400,000 shares of its common stock at $22.50 per share."

A sale of property at its fair market price is obviously not a dividend. On the other hand, a distribution of property is a dividend. The Commissioner contends that the stipulated facts show that the United stock was worth substantially more than $25 per share at the date of the first so-called "sales" of it, and that this excess value constituted a distribution of property by Superpower to its stockholders; that the Board erred in overlooking or disregarding the evidence of value afforded by the sales of rights and of United stock; and that, taking all the facts which appear in the stipulation, the findings of the Board on this point are arbitrary and without substantial support in the evidence, or rest on a mistake of law. January 26, 1929, May 8, 1929, and June 18, 1929, were the dates of the respective offerings fixed by Superpower for determining the stockholders of record to whom distribution of stock rights should be made, and these were the dates taken by the Commissioner for determining the value of the stock rights under the respective offerings.

The formal rights or "Purchase Certificates" under the first offer were issued by Superpower to stockholders on February 1 and expired on February 15, on which latter date the taxpayer exercised these rights. They were dealt in to a considerable extent before issue. On January 25, two days after the Superpower vote, 11,000 of them were sold on the Curb Exchange at prices ranging from 11⅝ to 12⅜, thereby putting a value of from 48 to 50 on the United stock. On January 28, 44,000 of them were dealt in on that Exchange at prices ranging from 12⅝ to 17½, thereby putting a value of from 50 to 60 on the United stock. On January 29, 30, and 31, Superpower itself sold about 9,200 shares of its United stock on the open market at from 50 to 63 per share. The second offering was likewise dealt in on the Curb Exchange from May 2, 1929, to May 24, 1929, and the third one from June 6, 1929, to July 2, 1929. In view of the large number of rights dealt in, these prices furnished almost conclusive evidence of the market value of United stock at the time when it was acquired by the taxpayer. The Board completely disregarded them; they are not referred to in its opinion, nor are the grounds on which they are disregarded stated. Apparently the Board held that an intention to make a distribution was essential in order to make the transaction a dividend. The question is not one of intention but of what was in fact done.

The statute defines "dividend." "The term 'dividend' when used in this title [chapter] * * * means any distribution made by a corporation to its shareholders, whether in money or in other

property," etc. Revenue Act of 1928, c. 852, § 115 (a), 45 Stat. 822, 26 U.S.C.A. § 115 and note. It says nothing about intention. The transaction is to be judged by the effect of it. Where the matter is doubtful the intention of the parties may well be accepted, especially when the property distributed has not a definitely ascertainable value which can be promptly realized. Here the property distributed was readily salable at about twice the amount paid for it. For practical purposes it was equivalent to money. We think the excess value of United stock above the price at which Superpower sold it was clearly a dividend. It was so held with reference to this very issue in Ramapo, Inc., v. Commissioner (C.C.A.2d, July 6, 1936) 84 F.(2d) 986. See Harvard Law Review, January, 1937, page 509, collecting and discussing decision on "bargain sales."

As to the second offer of United stock and the offer of Commonwealth & Southern stock: What has been said as to the first offer of United stock applies more strongly to the second offer, as to which the only reasonable conclusion from the stipulated facts was that the price of $30 per share was very substantially less than the established selling price of it. When Commonwealth & Southern was offered, the rights to purchase it were immediately valuable, selling on the Exchange at prices which nearly doubled the offering price of the stock. By the exercise of his rights, Mr. Palmer acquired stock in each case at substantially less than the market price of it.

■ We do not think, however, that the rights themselves were taxable income. If sold, the money received on them was a dividend; if exercised, the excess of value of the property acquired over the cash paid for it was a distribution of property and was taxable at its fair market value. The value of the rights is evidence of the excess of value. It may be that other factors should be considered in determining the amount of the dividend. We recognize the difficulties in dealing with *property* as *dividends. It is, however, explicitly so* provided in the statute. When the dividend is made in readily salable securities, the difficulties are not very real, the securities can be sold and the dividend converted into cash if the recipient so desires. If he chooses to continue the investment, it stands on the same footing as any other investment and subject to the same chances of depreciation.

■ The value of the shares of stock should be determined as of the dates when the stock rights were exercised, viz., under the first offering as of February 15, 1929, under the second offering as of May 24, 1929, and under the third one as of July 2, 1929, for these are the dates on which the taxpayer, in this case, in fact received taxable distributions. The dates taken by the Commissioner for this purpose were not the correct ones.

The decision of the Board of Tax Appeals is vacated, and the case is remanded to that Board for further proceedings not inconsistent with this opinion.

WILSON, Circuit Judge (dissenting).

In the main I agree as to the facts set forth in the opinion, but not to the conclusion drawn therefrom.

The Commissioner found that a fair market value of the securities transferred by the Superpower Company to the United Corporation, hereinafter referred to as "United," in exchange for 344,187 shares of preferred stock, 2,210,853 shares of common stock, and 1,000,000 option warrants entitled the Superpower Company to purchase 1,000,000 shares of United, was $72,480,000, upon the basis of which the Commissioner found that a fair market value of the common stock was $25 per share.

Superpower then offered to sell 821,472 shares of the common stock of United thus acquired to the stockholders of Superpower at $25 per share. In carrying out the proposal, Superpower issued to its stockholders what it termed "Purchase Certificates," thereby giving to each stockholder of Superpower the right to purchase at $25 per share one share of United for each two purchase certificates issued to him.

I agree with the opinion that the purchase certificates themselves did not represent taxable income, but I do not agree that when sold the amount received represented a dividend by Superpower, although it represented taxable income. Neither do I agree that, if exercised, the value of the shares of United received in "excess of the amount paid for it in cash was a distribution of property and taxable at its fair market value," and as a dividend. It was a sale at what the Commissioner determined was its fair market value.

A "dividend" as defined by the Revenue Act 1928, 45 Stat. 822, c. 852, § 115, 26 U.

S.C.A. § 115 and note, is "any distribution made by a corporation to its shareholders, whether in money or in other property, *out of its earnings or profits accumulated after February 28, 1913.*" (Italics supplied.) Ordinarily an increase in the market value of stock is not treated as profits until actually realized by sale or exchange.

Neither the purchase certificates nor the shares of United stock were a distribution of property from the earnings of Superpower; nor were the assets of Superpower or its earned surplus decreased by the sale of United stock at $25. In fact, according to the determination of the value of the Superpower securities by the Commissioner, which were exchanged for United stock, the actual value of its assets remained the same, though the book value of its assets were increased, for which Superpower accounted in its tax return for 1929. It was a substitution of an equal amount of cash for the value of each share of United Stock as determined by the Commissioner and sold under the options. Neither Superpower nor the taxpayer treated either the purchase certificates or the sale of United stock as a dividend, or as a distribution of property, but as a bona fide sale. The Board of Tax Appeals so found. Even if the United stock proved to have a market value in the boom market of 1929 over and above the cash paid, it could not be realized as income until sold. The Board may well have found that the trading in purchase certificates in such a market was not sufficient grounds for determining the fair market value of United stock. Other elements than sales on the Stock Exchange enter into the determination of a fair market value of stocks. San Francisco National Bank v. Dodge, 197 U.S. 70, 80, 25 S.Ct. 384, 49 L.Ed. 669.

The Ramapo Case (C.C.A.) 84 F.(2d) 986, presents a different state of facts from this case. In that case the taxpayer was a corporation, and both the Commissioner and the taxpayer found it to be for their interests to treat the purchase certificates and sale of United stock as dividends, which they did. The taxpayer sold a part of its purchase certificates and, of course, was taxable as income for the amount received therefor. It also sold the stock or a part of it acquired by the exercise of the remaining purchase certificates, and the profit gained by it was, of course, taxable. The situation which arises from the facts in this case was not considered by the court except in the form of dicta.

The premises assumed in the Ramapo opinion as a basis for holding that the issuing of the rights was a distribution of corporate assets, and that if the value of the United stock in excess of the price paid for it in cash represented earnings or surplus was a dividend, do not exist as facts found or stipulated in this case.

This was not a distribution of corporate assets, but a sale at a price found by the Commissioner to represent the fair market value of the United stock. The cash received therefor by Superpower restored to it as assets the proportionate fair market value of the securities exchanged by Superpower for the stock of United.

We are not concerned with what might have resulted if the petitioner had sold the purchase certificates, or had sold the stock acquired after the exercise of his right to purchase. He did neither.

In the Metcalf Case (Metcalf's Estate v. Commissioner (C.C.A.) 32 F.(2d) 192, cited in the Ramapo opinion, the rights were sold and there was no difficulty in determining the basis for an income tax.

In Helvering v. Bartlett (C.C.A.) 71 F. (2d) 598, at page 600, however, the court considered the exact situation which has arisen here and said in its opinion:

"We think that this holding of the Board was clearly right. We are not dealing with a case where a stockholder who has received rights to purchase stock sells the rights and thus realizes a profit. If the taxpayer here had sold the rights allotted him, the amount received in such sale would, of course, have been taxable as income. Miles v. Safe Deposit & Trust Co., 259 U.S. 247, 42 S.Ct. 483, 66 L.Ed. 923; Metcalf's Estate v. Commissioner (C.C.A. 2d) 32 F.(2d) 192. But he did not sell the rights. He exercised the option which they conferred upon him to purchase stock in the fire company; and he has as yet realized no profit upon this transaction. The rights were nothing but options to purchase stock, and the fact that they were allotted to stockholders of the Guaranty Company did not make them in any sense dividends. An option is but a continuing offer; and, when the offer is accepted, it is merged in the contract which results. We have, then, nothing upon which to predicate an assessment of the tax but a purchase of stock by the taxpayer; and it is well settled that such a transaction does not

give rise to taxable income until a profit is realized by the sale of the stock purchased. The taxing statutes are not based upon the theory that a man can 'buy himself rich.'"

In Miles v. Safe Deposit & Trust Co., 259 U.S. 247, 42 S.Ct. 483, 66 L.Ed. 923, it was held that, where a stockholder sold rights to subscribe to new stock in a corporation, the amount thus realized was taxable as income; but the court pointed out that, if he had decided to accept the new shares instead of selling the rights, there would have been no profit and hence no taxable income. In that case it was the stock of the same corporation; but the court held that the same principle would hold as to the purchase of stock of another corporation. No profit is realized upon a purchase; and the mere right to purchase is not to be treated as a dividend or distribution of assets, unless the right to purchase is a mere cloak for what in fact is a dividend.

There is no evidence that the offering of the stock of the United was intended by Superpower as a cloak for what in fact was a dividend. The Board of Tax Appeals found as a fact that it was not. This court cannot review this finding.

Taxation is a practical matter. The income tax law is concerned, generally speaking, only with realized gains or losses. Lucas v. American Code Company, Inc., 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538, 67 A.L.R. 1010; Burnet v. Logan, 283 U.S. 404, 413, 51 S.Ct. 550, 552, 75 L.Ed. 1143; Weiss v. Wiener, 279 U.S. 333, 335, 49 S.Ct. 337, 73 L.Ed. 720; United States v. S. S. White Dental Manufacturing Company, 274 U.S. 398, 401, 47 S.Ct. 598, 599, 71 L.Ed. 1120. No gain is realized by a taxpayer as a result of the allotment to him of rights to purchase, or of a purchase under those rights until the stock acquired is sold. That he might have realized a profit if he had sold the rights is beside the point. Helvering v. Bartlett, supra. Taxes must be imposed on the basis of what happened, not on the basis of what might have happened.

Obviously the taxpayer cannot be taxed as income based on the selling price of the purchase certificates during the period he held them, since he did not realize income from them. If he failed to exercise them, he could claim no loss. Eastern Shares Corporation v. Commissioner, 32 B.T.A. 608. To him they simply represented a right to buy United stock. When exercised they became merely an acceptance of an offer to sell. If the stock proved to have an increased market value in the boom market of 1929 over the cash paid the company, he has not realized on it. To determine taxable income there must be a sale or exchange of property, or something definite other than a fluctuating stock exchange market. The court does not recognize theoretical gains or losses.

As the court said in Commissioner v. Cummings (C.C.A.) 77 F.(2d) 670, 672: "Taxation does not concern itself with hypotheses, but with real situations." Citing Helvering v. Bartlett, supra.

I think the decision of the Board should have been affirmed.